## Stack *versus* O'Hara.

| 98 | 213 |
|-----|-----|
| 206 | 154 |

1. By the laws and customs of the Roman Catholic Church in the United States a priest is liable to be removed from the charge of a congregation at the pleasure of his bishop, without trial. He cannot, however, be suspended from his priestly functions without specific accusation and trial.

2. A Roman Catholic bishop wrote to A., a priest in his diocese, as follows: "Your administration of the affairs connected with the Church of the Annunciation has been such that I feel myself compelled to remove you and leave the church vacant. And I now forbid you to exercise any priestly functions at W., even to say mass. This prohibition binds *sub gravi.*" On the same day said bishop wrote to another priest in W., telling him what he had done, directing how the church property and congregation should be cared for, and concluding, "I am much pained to adopt this severe course, but the state of things in that congregation is such that I would consider myself wanting in duty to allow it to continue any longer." A., who had obeyed the orders of his bishop and abandoned the church, wrote a few days afterwards a letter stating that the bishop intended to give him a mission, and that he was then preaching at another place in the same diocese. Subsequently A. brought suit against said bishop to recover damages for the injury done him by reason of the defendant's action as above stated. On the trial of the cause the court, at the request of the plaintiff, construed the effect of the defendant's letters, as explained by that of the plaintiff, saying that their effect was simply to remove the plaintiff from the care of his church, and to prohibit him from exercising priestly functions in W., but not to prohibit him from exercising priestly functions in the rest of the diocese. A verdict and judgment being rendered for defendant, and plaintiff having assigned the above construction of said letters for error, *Held*, that the construction was correct and did not constitute error.

3. In the case above set forth, the court instructed the jury that the plaintiff had been removed by defendant from his charge, but that in order to enable him to recover damages they must be satisfied that said removal was unlawful and wrongful. The court then further left it to the jury to say whether or not the plaintiff had faithfully performed certain duties required of him by the law of the Roman Catholic Church, the principal of which were the accurate keeping of accounts of church receipts and expenses, and the exhibition of the same at stated periods to the bishop. If plaintiff had not performed these duties then the court instructed the jury that his removal by the defendant was lawful and reasonable. *Held*, without deciding whether or not this instruction erred in the plaintiff's favor, that it certainly did not constitute error of which he could take advantage.

4. O'Hara *v.* Stack, 9 Norris 477, explained.

MERCUR and GORDON, JJ., dissent.

[Stack *v.* O'Hara.]

June 1st 1881. Before Sharswood, C. J., Mercur, Gordon, Paxson, Trunkey, Sterrett and Green, JJ.

Error to the Court of Common Pleas of *Lycoming county:* Of May Term 1881, No. 6.

Case, by M. P. Stack against William O'Hara. The narr. averred that the said plaintiff being a priest of the Roman Catholic Church, in due and lawful charge of the church and congregation of the Church of the Annunciation, in Williamsport, in the diocese of Scranton, and within the jurisdiction of the defendant as bishop of said diocese, was by the said bishop wrongfully and unlawfully dismissed and removed from his charge as priest and pastor of said church, and prohibited from exercising any priestly function in Williamsport, and deprived from exercising the faculties which pertained to him as priest and pastor in said church, whereby he was deprived of his emoluments, pew rents, fees and perquisites, and other revenues and income, and the living to which he was entitled by virtue of his office, to the damage of the plaintiff, $50,000.

The defendant pleaded "not guilty," and, specially, that the plaintiff had not the right to exercise the faculties and functions of a priest of the Catholic Church in the Church of the Annunciation free from the hindrance, disturbance and deprivation by the defendant.

On the trial, the following facts appeared:

The plaintiff was ordained a priest of the Roman Catholic Church in 1865, by Bishop, now Archbishop Wood of the diocese of Philadelphia.

In 1866, the plaintiff was sent by Bishop Wood to Williamsport, Pennsylvania, then a part of the diocese of Philadelphia, to establish and take charge of a congregation of "Non-German Catholics." Prior to 1866, the German and the Non-German Catholics had been worshiping together. The plaintiff entered upon the duties, a church was built and dedicated in August 1868, and named "Church of the Annunciation."

In 1868, a new diocese was formed out of a part of the diocese of Philadelphia, viz.: the diocese of Scranton, of which the Rt. Rev. William O'Hara became the bishop. The city of Williamsport was included within the limits of the new diocese, and the ecclesiastical jurisdiction of Williamsport thereupon became vested in the new bishop. At the time of the division of the diocese, a debt had been incurred by the new Church of the Annunciation and during the ensuing two or three years, the financial affairs of the church were in an unsatisfactory condition, and considerable dissatisfaction arose on the part of some members of the congregation with the business management of Father Stack. Complaints were made to the bishop, who vis-

[Stack *v.* O'Hara.]

ited Williamsport and endeavored to heal the differences, but without success.

On November 5th 1871, Bishop O'Hara wrote the following letter to the plaintiff:

"Rev. M. P. Stack,

"*Rev. Sir:* Your administration of the affairs connected with the church of the Annunciation has been such that I feel myself compelled to remove you, and leave the church vacant. And I now forbid you to exercise any priestly function in Williamsport, even to say mass. This prohibition binds *sub gravi.* You may call on me at Scranton, and I will inform you of my further intention in your regard.

W. O'Hara,

Nov. 5, 1871.         .      *Bp. Scranton.*"

On the same day, Bishop O'Hara wrote the following letter to the Rev. J. Kœper, the priest in charge of the German Catholic Church at Williamsport:

"Rev. Dear Sir:

I enclose you $600, which I wish you to pay to Mr. McCrystal, or his attorney, Mr. Norris. There is a sheriff's writ against the church of the Annunciation; it can be sold at any moment. Should this sum not be sufficient, pay the balance yourself, and then I will remit it to you. You will also take charge of all things connected with that church, such as vestments, furniture, books, etc., and keep them under your custody. They can remain in the house and church, but you will keep the keys. You may baptize and attend the sick, but nothing else. I am much pained to adopt this severe course, but the state of things in that congregation is such that I would consider myself wanting in duty to allow it to continue any longer.

Yours in X,           W. O'Hara,

Nov. 5, 1871.       .         *Bp. Scranton.*"

The following letter from the plaintiff to the Rev. J. Kœper, dated November 9th 1871, was given in evidence:

"Scranton, Luzerne Co., Pa., Nov. 9, 1871.

"Rev. J. Kœper,

"*Dear Friend:* Things have gone very well with me at headquarters. I have been treated kindly and considerately. The bishop says he will give me a mission of good income and free of debt. He thinks, very properly, that I do not relish the idea

of paying off debts, or engaging myself with brick and mortar. He further suits my wish by affording a vacation of some ten days, at the expiration of which he will have prepared the mission desired, as above. He holds to his intention of punishing the Irish congregation of Williamsport; says he will not send a priest there for some time. On reflection I think this course may prove beneficial. I intend going to Friendsville with Slattery for Sunday, and preaching for the natives. I will be in Williamsport on Wednesday of next week at farthest, and proceed at once to your residence. Until then and ever believe me,

Yours truly,          M. P. STACK.

" P. S.—Be good enough to call at my late residence and tell the housekeeper to keep the house open till I come."

Voluminous documentary and expert evidence was presented to show the status of the Roman Catholic Church in the United States and the relative powers and obligations of its bishops and priests with respect to the question of the right of the bishop to remove the priest, for cause, at his discretion, without a trial, the material portions of which are referred to in the opinion of this court.

Much evidence was also given to show lack of executive ability and positive mismanagement on the part of the plaintiff in the temporal affairs of the church prior to his removal by the bishop. The testimony tended to show, among other things, that from August 1868, to November 1871, the plaintiff had failed to render to the bishop annual statements of the condition, the income, and expenditure of the church, as it was his duty by the rules of the church to do, though repeatedly called on for his accounts. There was also evidence that the plaintiff had given a due bill on February 1st 1869, for borrowed money to one P. McCrystal, on which suit was brought in 1870 against Bishop O'Hara, and the plaintiff accepted service of the summons, but no notice was sent to the bishop. Judgment was obtained, on this service, against the bishop, who paid it under notice from counsel that unless the judgment was paid, the Church of the Annunciation would be sold.

Within a short time after the plaintiff's removal, Bishop O'Hara informally offered him a mission to Athens, at which the plaintiff expressed dissatisfaction, and he did not accept the offer.

On December 1st 1871, the plaintiff filed a bill in equity against Bishop O'Hara in the court of common pleas of Lycoming county, praying a decree that his removal and the prohibition by the bishop forbidding him to exercise any priestly function in Williamsport, was unlawful, and that he be restored to

[Stack v. O'Hara.]

his church, and to the rights and emoluments of his office. On Nov. 13th 1877, the said court entered a decree in accordance with the prayers of the bill, to the effect that the bishop's action in removing the plaintiff and forbidding him to exercise priestly functions in Williamsport, was unlawful, but the court granted no specific relief. It was further ordered that "The defendant pay costs." Upon an appeal by B'shop O'Hara to this court, the decree was affirmed October 6th 1879. (See O'Hara v. Stack, 9 Norris 477.) Upon January 19th 1880, this court refused a motion for a re-argument, SHARSWOOD, C. J., filing an opinion explanatory of the decree of affirmance, October 6th 1879. (See 9 Norris 492.)

The plaintiff submitted the following points:

"(1) If the defendant removed the plaintiff, as pastor of the Church of the Annunciation in Williamsport, for an alleged offense, as contained in his letter to the defendant of Nov. 5th 1871, without regular accusation, hearing, or trial, such removal was unlawful. *Answer.* We refuse to charge you as requested in this point. We have stated to you upon what grounds you are to ascertain whether this act was lawful or unlawful. We do not decide it for you."

"(2) If the prohibition of the plaintiff by the defendant, forbidding him to exercise any priestly function in Williamsport, even to say mass, as contained in said letter of Nov. 5th 1871, was in consequence of accusation of offense, as contained in the same letter, such prohibition was unlawful. *Answer.* We decline to charge you as requested in this point."

"(3) It is the province of the court to construe or interpret the letter of the defendant to the plaintiff, of Nov. 5th 1871. *Answer.* [This point we affirm. It is the duty of the court to construe matters of evidence which are in writing. This letter is the act of the bishop by which the plaintiff was removed from his office. The point we now have before us asks that the court shall construe it, without giving us any suggestion upon which branch of it they desire us to make the construction; but the point following, to which we will presently refer, presents their views in that respect. (The court here read the letter.) Now, we say to you, first, that this letter is a *mere* removal, and not a suspension. It also contains a prohibition against the person to whom it is addressed, forbidding him from exercising priestly functions *in* Williamsport. It makes no accusation of crime nor of moral fault. You will observe in the first sentence of the letter: 'Your administration of the affairs connected with the Church of the Annunciation has been such,' &c.; it does not read: Your administration of the Church of the Annunciation

has been such; but it is upon the administration of the *affairs connected with* the church—not the churchly duties themselves, but affairs connected with them—which is the cause of his feeling "compelled to remove," not to suspend—there is no such word here. Much discussion has been had before you in regard to the meaning of the words *sub gravi,* as used here. The connection in which they occur is this: 'And I now forbid you to exercise any priestly function in Williamsport even to say mass. This prohibition;' now the prohibition is something which has been prohibited or forbidden, and it therefore applies to the sentence immediately preceding, which forbids him to exercise any priestly function in Williamsport. 'This prohibition binds *sub gravi.*' That is, you are to consider this a serious precept, a serious command, a grave command of your superior. If you violate this prohibition you will commit a grave offense. And you will observe that is the inference from it, and when we give the interpretation to this sentence, 'if you violate this prohibition you will commit a grave offense,' you observe that those words apply then to something yet to take place. If you do hereafter disobey this order you will commit the offense. It does not and cannot be made to relate to the 'administration of the affairs connected with the Church of the Annunciation,' as mentioned in the first part of the letter. It has nothing to do with that.

"We say to you, further, that the effect of this letter was to remove the priest from the Church of the Annunciation in Williamsport, and to prohibit him from exercising his faculties within what was known as the Church of the Annunciation of Williamsport; that outside of that territory his priestly functions were not affected, and they remained the same after as they were before the removal. Before the removal he could not go into another pastor's church to officiaté without an invitation so to do; and nothing prevented him after his removal from accepting all such invitations outside of Williamsport. This not only courtesy but common decency demands, in all religious bodies. No priest or preacher thinks of going into another's church to preach without an invitation. He has no right to do so. We think this the plain and sound interpretation of this letter, and that it is not a difficult one to understand at all.] We think this is not only the plain interpretation of the words of the letter, but from subsequent acts it seems plain that such was the meaning intended by the person who wrote it, and, also, that that was what was understood by the person who received it. That such was meant by the bishop is made manifest by his subsequent treatment of Father Stack when he called

[Stack *v.* O'Hara.]

upon him ; and that such was understood to be the effect of the letter by Father Stack when he received it is manifest from the letter which he wrote to Father Kœper, four days later (Nov. 9th 1871), in which he says : ' Things have gone very well with me at headquarters.  I have been treated kindly and considerately.  The bishop says he will give me a mission of good income and free of debt.  He thinks, very properly, that I do not relish the idea of paying off debts, or engaging myself with brick and mortar.  He further suits my wish by affording a vacation of some ten days, at the expiration of which he will have prepared the mission desired, as above.'  (The court here read this letter in full.)

" To effect a different construction of this letter two words are taken from the letter written by Bishop O'Hara to Father Kœper on the same day that the letter was written to Father Stack, and from those two words an interpretation is sought for the letter to Father Stack.  The words referred to are ' severe course.'

" [On the same day Bishop O'Hara wrote to Father Stack he also wrote to Father Kœper.  He says : ' I inclose you $600, which I wish you to pay to Mr. McCrystal, or his attorney, Mr. Norris.  There is a sheriff's writ against the Church of the Annunciation ; it can be sold at any moment.  Should this sum not be sufficient, pay the balance yourself, and then I will remit it to you.  You will also take charge of all things connected with that church, such as vestments, furniture, books, &c., and keep them under your custody.  They can remain in the house and church, but you will keep the keys.  You may baptize and attend the sick, but nothing else.  I am much pained to adopt this severe course, but the state of things in that congregation is such that I would consider myself wanting in duty to allow it to continue any longer.'

" Now, the words ' severe course,' here spoken of, have no relation whatever to what had been done by the bishop with the priest.  He is talking now entirely upon the subject of the treatment of the congregation.  He says : ' You may baptize and attend the sick, but nothing else.  I am much pained to adopt this severe course, but the state of things in that congregation is such,' &c., &c.  He is not referring at all to his removal of the priest, but to his intended treatment of the congregation.  This seems plain from the very reading of the letter itself.  That he had an intention of doing this thing, and that Father Stack knew that he intended to do it, is manifested in the letter which Father Stack wrote to Father Kœper on the 9th of November, four days afterwards, because, in that letter, in addition to what I have read, he also says : ' He holds to his in-

[Stack *v.* O'Hara.]

tention of punishing the Irish congregation of Williamsport—
says he will not send a priest there for some time. On reflec-
tion, I think this course may prove beneficial.' So that is the
matter to which the words 'severe course' apply.] I think,
gentlemen, that covers all the matters that I deem necessary to
speak of upon the subject of the letter of November 5th, except
such as may arise from answering points further."

"(4) That the said letter did accuse the plaintiff of malad-
ministration of the affairs connected with the church of the An-
nunciation, and removed him as pastor of that Church, and for-
bid him to exercise any priestly functions in Williamsport, even
to say mass. *Answer*. This point we affirm with the under-
standing that by the word 'maladministration' we do not
mean that any moral fault or criminal offense is intended."

"(5) If the act of the defendant in removing the plaintiff,
as contained in his letter of Nov. 5th 1871, was unlawful, the
plaintiff is entitled to a verdict for such an amount of damages
as will compensate him for the income which he was entitled to
have and enjoy as pastor of the Church of the Annunciation,
and of which he was deprived by the unlawful act of the de-
fendant. *Answer*. This point we affirm. That is the law.
But we deem it necessary to say something to you in regard to
the manner of arriving at the amount of damages, if you should
find that this act was unlawful. You observe nothing is claimed
here but actual damages. There is no claim made by way of
vindictive damages for a malicious act. A full statement has
been given to you by the counsel for the plaintiff, of the evi-
dence covering the receipts of the church from the time Father
Stack left it until the bringing of this suit. It is unnecessary
for me to recapitulate it. A few general observations are,
however, deemed necessary. The first is, if you find the act an
unlawful one, in ascertaining the damages done by the removal
of the priest from his office as pastor of this church, you are
to remember that the priestly office is not an office held for
profit or for the accumulation of gain. You are also to remem-
ber that the injury complained of here, the removal of the
plaintiff from his office, has not impaired his physical or mental
powers. As we remember the testimony of the witnesses, it was
to the effect that the obligation of the priest bound him for life,
and excluded him from occupation which was denominated by
the witnesses—I think by the plaintiff himself—as sordid trade,
buying or selling; and there may be, therefore, kinds of em-
ployment which he might be engaged in which would not come
under the head of sordid trade. After ascertaining this probable
income, if he had continued in his office, you must then deduct a
sum which would be equivalent to the probable earnings of the

[Stack *v.* O'Hara.]

plaintiff in such other employment as he is permitted to engage in—if you should find there are any—and which he might earn by a reasonable exercise of his physical and mental powers."

The defendant presented the following points:

"(1) That to enable the plaintiff to recover, the jury must be satisfied from the evidence that the plaintiff was wrongfully and maliciously removed from his charge. *Answer.* This point we affirm, making only the change of the word unlawfully for the word 'maliciously,' so that the point will read: 'To enable the plaintiff to recover, the jury must be satisfied from the evidence that the plaintiff was wrongfully and unlawfully removed from his charge.'

"(2) That from all the evidence in the cause the plaintiff, under the laws of the church, was removable at the will of his bishop; and the plaintiff, having failed to show that the removal in fact was accompanied with malice, he cannot recover." *Answer.* This point and the further question as to whether or not, under all the evidence in the cause, and the law and the established customs and usages of the church, the plaintiff is entitled to recover, we reserve for further consideration. Your verdict will be rendered subject to the decision of the court upon the two points reserved."

The court charged the jury, *inter alia,* as follows:

"The first question, then, is the question of whether or not the act complained of was an unlawful or wrongful act? The question of damages does not arise until after that question has been settled. Now, the defendant, in the trial of the cause here, does not deny that he did remove the plaintiff. The plea denies it, it is true, by the words "not guilty," but the evidence in the cause and the statements of counsel admit that the bishop did remove the plaintiff. But they claim that it was not unlawful; that it was not wrongful; but, on the contrary, that it was right, and that it was the duty of the bishop.

"Something has been said to you about the effect of the previous litigation between these parties in this court and in the Supreme Court, and [I desire to say to you here, and it is to be binding upon you as law coming from the court, that that proceeding in equity, from the beginning to the end of it, decides nothing for you and nothing for us in this case. It decides *nothing,* either as to the unlawful act, or as to the nature of the act in any way. The only question that went to the Supreme Court was the question of costs, and that was the only question passed upon by them.] And that we may not be mistaken in this, I read to you a paper filed by Chief Justice SHARSWOOD subsequent to the delivery of the opinion of the court in the case. He says, on the motion for a reargument of the cause, "I desire to add for

myself that I think the learned counsel of the appellant have misapprehended the opinion and decision of the court in this case. I did not and do not understand that it settled anything as to the powers and rights of the bishops of the Roman Catholic Church over the priests. The only decree of the court below adverse to the appellant was that upon the subject of the costs." And he says again : " In concurring in the decree of affirmance all that I meant to decide, and all I think that was meant to be decided, was that under the special circumstances of the case the judge befow exercised a sound discretion in the matter of the costs." Therefore, we say to you that there is nothing affecting the case from beginning to end that decides any portion of this case.

" Now, let us look at what the plaintiff was deprived of in this case. It is claimed that he was removed from his office as pastor of the Church of the Annunciation. The removal is admitted. Let us see what he was deprived of. · We find in the evidence that the plaintiff was the pastor of the Church of the Annunciation, in Williamsport ; that he had been placed there by the bishop of Philadelphia, and that, by the erection of the diocese of Scranton out of the territory which comprised the diocese of Philadelphia, he became subject to the bishop of the diocese of Scranton, who is this defendant. We also find that both the plaintiff and the defendant held office under the laws, customs and established usages of the Catholic Church in the United States at the time of the injury complained of. They were both equally bound by these laws when they took their offices, and they both agreed to obey these laws, and to conform to these usages. These laws and usages not only regulated their conduct in their respective offices, but also governed their official relations with each other. Now, the injury complained of here is one arising out of the conduct towards each other of the plaintiff and defendant as officers of the church. They were both bound to know the laws, customs and usages of the church under which they accepted their offices. Each was bound to the church to perform all the material things required of him in his office, and each had agreed to submit to and be governed by these laws. Thus we find that the laws of the church must govern both the plaintiff and the defendant in their official action towards each other. They both consented and agreed to this. What title had the plaintiff to this office of which he has been deprived? Where did he get it? How does he hold it? We find that he was invested with priestly orders by the bishop of Philadelphia, and the obligations which he took at that time were read in your hearing. They bind him for life under the promises of obedience and reverence to his bishop or ordinary. [Whatever

office he holds he got from the bishop, and he holds it subject to the will of the bishop. It was not an office of his own creation. He had not made it. He did not own it as we own other property. He was placed in possession of it subject to the will of the bishop who might be over him.] (13th assignment of error.) The plaintiff was bound to know the law and established usages of the church under which he held his office, and it was his duty to perform everything prescribed for him to do as a priest, and it was his duty to perform fully, as required by the laws of the church under which he was acting, all things required of him as pastor of the particular church which he then occupied. What power had the bishop over this pastor, under the laws of the church? [We say to you that under the law of the church, governing both the plaintiff and the defendant, and governing their relations with each other, the bishop had not only the right, but it was his duty to remove the plaintiff for any cause which would be deemed sufficient to warrant such an act.] But the bishop had no right to remove this plaintiff from any malevolent or capricious spirit; he had no right to exercise this power of removal without a reasonable cause. If the bishop removed the plaintiff in good faith, and for a reasonable cause, believing that it was for the best interests of the church or the good of the plaintiff that he should do so, then his act was not unlawful, nor was it wrongful. [We say to you as a matter of law that if the bishop removed the plaintiff for reasonable cause, and believed that the act was for the best interests of the church and the plaintiff, then this act of removal was not unlawful or wrongful, and the plaintiff is not entitled to recover in this action.] If the bishop did what was his duty in the premises, under the law of the church, and the circumstances of the case, he cannot be held responsible for the injury following from the lawful performance of his duty. Was there, then, any reasonable cause for this removal? That is finally the question which you are to determine as a question of fact. Did the plaintiff, Father Stack, perform all the material duties of the office from which he has been removed? If he did, there could be no cause for his removal. Did the plaintiff neglect to perform any of the material duties of his office? If he did, then were they of such a character as would be deemed sufficient cause for his removal? The principal allegation of neglect against the plaintiff here is that he neglected or refused to keep proper memoranda or books of account of the doings in his pastorate; second, that he neglected or refused to make annual returns to the bishop of the transactions of his pastorate, especially as to the financial concerns thereof; and, third, that he did not confer with his bishop with regard to the amount of his own salary. Now, the matter of keeping

books and memoranda for the purpose of enabling the priest to make up his accounts, you are to understand as not including an intricate system of book-keeping. It is not expected that the priest should have a set of books such as a merchant would have. As you will see, all that is needed is the two sides, cash received and cash paid out; and you will see, also, that it requires no skill to keep such an account. All it requires is the ability to write and make figures. . . . .

"Now, as to these matters that are complained of as failures to perform duty on the part of the priest, the plaintiff in this case, we find they are matters which are taken notice of by the church, and they have prescribed rules and regulations in regard to the keeping of these accounts, and in regard to making the annual returns to the bishop. It is not for you to say, nor is it for us to say, that these matters are of no importance. The only question is, are they required by the church? If they are, then a failure to perform them is neglect of duty; and the refusal to perform them, after request by the bishop, is a willful dereliction of duty.

"[We therefore say to you as a matter of law, that if you find this plaintiff did not keep such memoranda or books of account as would enable him to make the statements required by the rules, and did not send annual statements to his bishop, such as are required by the rules, that it was the right and it was the duty of the bishop to remove him, and for so doing the bishop cannot be held liable in this action.] (16th assignment.)

"[Did the plaintiff perform his duty, then, in these respects? If he did not he has no right to complain of his removal. When he neglected and refused to perform his duties—if you should find that he did so—he knew the law of the church required his removal, and he was bound to know that. The failure of the priest in the performance of his duty could not release the bishop from the performance of his duty. If you find the plaintiff did neglect and refuse to perform his duty as we have stated to you, then the bishop had no alternative; he must remove him or do worse. This is the turning-point in the case.] (17th assignment.)

"The plaintiff says he was unlawfully removed by the defendant. The defendant admits he removed the plaintiff, but he says it was not an unlawful or wrongful act, but was his bounden duty, because of the neglect and refusal of the plaintiff to perform his duty as pastor of the Church of the Annunciation. Now, did the plaintiff neglect and refuse to perform his duty? It will be your duty to consider all the evidence in ascertaining and settling this question. You have his own testimony upon this point. You have from him what kind of books or memo-

randa he kept of his accounts. You have seen his ability to show the receipts and disbursements of the parish. Did he keep any books of account of any kind that would show the receipts and disbursements of his pastorate, such as would enable him to make the statements required by the rules of the church? Was he able to furnish you with a statement of what he used himself? Could he tell you what the revenues or income of the Church of the Annunciation were while he was pastor? An example of the manner in which these accounts may be kept was introduced when Father Garvey was put upon the stand, and you see what a simple account it is. Did the plaintiff furnish annually to his bishop a statement of the transactions and of the financial condition of his pastorate? Could he at any time have furnished such a statement as was required of him? The bishop, in his testimony, says that he urged him over and over again, wrote to him time and time again, urging him to do his duty in this respect, and that he did not do so. Is there any denial of that evidence? [Is it true that the bishop urged him and repeatedly wrote to him for his statements, and is it true that he never sent them to the bishop, or that the bishop never received them? If you find that the plaintiff neglected his duty in these respects, then we say to you that the bishop was bound by the obligation of his office to remove the plaintiff, and the plaintiff has no just cause of complaint for such removal.] (18th assignment.) If, on the other hand, you should find that the plaintiff did perform all the duties of his office as pastor of the Church of the Annunciation, of Williamsport, and that the defendant had no reasonable cause for removing him, or that he removed him from mere caprice or whim, or from any spirit of malevolence or vindictiveness, then the plaintiff will be entitled to recover such damages as will compensate him for the injury done. What we have to say on this point will be more fully expressed when we come to answer the last point of the plaintiff.

"Now a few other matters, we think, should be called to your attention. [The act of the bishop, as we stated to you, was a removal and not a suspension.] We say to you as matter of law, that when the bishop removed the plaintiff he was not bound to furnish an equally important office as a condition precedent to such removal. Nor is he bound to have any place beforehand for the priest removed. The bishop is entitled to a reasonable time in which to find a place for the pastor removed. [If you find that the removal was for a reasonable cause, and that the plaintiff refused the place offered him, and subsequently disobeyed the orders of his bishop, and has continued in his disobedience, he has no just cause of complaint that he is not now in office. Now, you are to remember that you have

[Stack *v.* O'Hara.]

no power to make laws for the Catholic Church in this diocese. On this subject the only question is, what is the law of the church? And this question is answered to you by the court. We have stated to you what the law of the church is, so far as we have deemed it necessary for you to know.] You may have no faith in the doctrines and beliefs of the Catholic Church; you may have prejudices against the church as a religious body, but you are not to allow these things to affect your judgment in any manner. The parties to this action are bound by the laws and established customs and usages of the Catholic Church. . . . . .

"If you find that this act of removal was for a reasonable cause, and that it was done by the bishop, believing that he was serving the best interests of the church, or that it was for the good of the plaintiff, then the defendant is not to be held responsible for his official act, and your verdict would be for the defendant, subject to the decision of the court on the points reserved."

Verdict for the defendant, subject to the decision of the court on the points reserved.

On May 22d 1880, the points reserved were negatived by the court *pro forma*, and judgment was entered on the verdict. The plaintiff took this writ of error, assigning for error *inter alia*, the answers to plaintiff's and defendant's points and the portions of the charge of the court included in brackets.

*Samuel Linn* and *W. H. Armstrong* (*William S. Price* with them), for plaintiff in error.—The decree in the equity suit (9 Norris 477) was a conclusive adjudication that the plaintiff's removal by the defendant was unlawful. His right to relief or to damages was thereby settled, and the purpose of this action was to determine the amount of damages to which he was entitled. The letter of the bishop, of November 5th 1871, was fully considered in the equity suit and its construction is *res adjudicata.* The court below, we think, misapprehended the views expressed by SHARSWOOD, C. J., in refusing the defendant's application for a reargument. The bill, answer and evidence were all directed to one single question, viz., whether the summary removal of the plaintiff and the prohibition to exercise priestly functions in Williamsport, without regular accusation, hearing or trial, was unlawful; and the decree was explicit that it was unlawful. On appeal to this court the judgment was, "decree affirmed and appeal dismissed at the costs of the appellant." The opinion of the court, delivered by MERCUR, J., considered the entire merits. Two of the justices dissented upon the express ground that the decree was conclusive of the illegality of the removal, and left the damages to be settled by a

jury, but the dissent did not, of course, affect the validity of the decree. The court subsequently refused a motion for a re-argument. The Chief Justice, in a brief opinion, the opening words of which are "I desire to add *for myself*," said, "I did not and do not understand that it [the decision of the Supreme Court] settled anything as to the powers and rights of the bishops of the Roman Catholic Church over the priests." Even if this were equivalent to a dissent from the original decree it would not affect its validity as the decree of the court; but the learned Chief Justice adds, "It appeared to me that whether the appellant had or had not the power which he assumed and ex-ercised over the appellee, that *in reason and in good conscience he was bound to make known to him the ground of his proceed-ing,* that neither he nor the church would be left to conjecture that it was conduct which affected his character as a clergy-man."

The gravamen of the complaint is the letter of November 5th 1871, which removed the plaintiff without accusation or trial. There are some grounds, no doubt, on which a bishop may lawfully remove a priest from one pastorate to another without trial, and without reflection on his character: as for bodily illness, mental infirmity, blindness, etc. ; but we assert that there is no law of the church nor law of the land, which authorizes a bishop to remove a priest from his pastorate for any cause affecting his character or involving a criminal offense, without a regular accusation, hearing, or trial. The real ground of removal here is shown by the evidence to be alleged mis-management by Father Stack of the finances and the appro-priation of funds of the church to his own use. The letter of removal, although ingeniously written, admits the cause of removal to be the plaintiff's "administration of the affairs con-nected with the church." Every one knew that this referred to the charge that Father Stack had been receiving and retaining church funds, without accounting therefor. Under the laws of the church, a priest charged with a moral offense is entitled to a hearing before two priests and the bishop. Such a trial is a condition precedent to removal, or other punishment, and no de-mand by the priest is necessary. But here there was no hearing, no trial, no conviction, nothing but charges, followed by sum-mary punishment. A priest's profession is his property, and to de-prive him of it arbitrarily is opposed to the law of the land as well as that of the church. It is said he was not deprived of his office, that he is a priest still and will be until death. Admit it, but he is removed from his living annexed to his office, and prohib-ited from exercising priestly functions in his parish. He can-not intrude into another parish to officiate. This is virtually a

[Stack *v.* O'Hara.]

dismissal, and is at least a deprivation of property *pro tanto;* he is entitled to be restored, if but for the purposes of trial: Kerr's Appeal, 8 Norris 97, 112; Fields *v.* Commonwealth, 8 Casey 478.

The court erred in its construction of the bishop's letter to the Rev. Kœper. The words in it "I am much pained to adopt this severe course" following the reference to the Mc-Crystal suit (in which, it was alleged Father Stack had accepted service of the writ for the bishop, and allowed judgment to be taken by default), clearly refer to the punishment imposed on Stack, and not to any punishment on the congregation.

*J. O. Parker* and *R. P. Allen* (*R. S. Bentley, Jr.*, with them), for the defendant in error.—In the equity suit, the sole question before the Supreme Court was the question of costs. As to that, and that only, the decree is *res adjudicata.* No *relief* was decreed in the court below. The opinion expressed by the court below as to the illegality of the removal was gratuitous, in view of the fact that no relief was granted. With the exception of bills to perpetuate testimony and for discovery, there is no such thing known to chancery practice as a bill which does not pray for relief, or a decree upon a bill praying relief, refusing the relief, and decreeing the status of an abstract right. It could not be presumed that the Supreme Court intended to affirm so strange an anomaly, even if the Chief Justice in his supplemental opinion had not declared the effect of the decree. The appeal in the equity suit was heard by five of the justices of this court. Two dissented, and the Chief Justice, in his supplemental opinion, declared that "all he meant to decide, and all he thought was meant to be decided, was that, under the special circumstances of the case, the judge below exercised a sound discretion, when he refused to impose all the costs upon the appellee." Whatever the *form* of the decree, therefore, three of the five judges who heard the appeal did *not* find judicially that the removal was unlawful.

The Roman Catholic Church in the United States is upon a missionary basis, and the authority of the bishops extends to the appointment and removal of priests to mission pastorates within their jurisdiction, at their will. This is the construction of all the learned doctors and bishops, who have been examined as experts, as to the effect of the vast body of canon law, written in a dead language, whose testimony is accepted on both sides as unimpeachable. " Removal" is a technical word in the church, differing from " suspension" or " dismissal," and does not imply any commission of crime or grave fault by the priest. Removal is a right vested in the bishop, exercisable at discretion,

[Stack *v.* O'Hara.]

without right on the part of the priest to demand any cause to be shown or to demand a trial by ecclesiastical procedure; but even if such a trial were demandable under the laws of the church, such a demand is a condition precedent to a civil suit for damages. No such demand was ever made by the plaintiff, and in such case, a civil court will not decide whether or not the action or non-action of an ecclesiastical body or tribunal is right or wrong over a subject-matter admittedly within their jurisdiction: Watson *v.* Jones, 13 Wallace 679; German Ref. Church *v.* Commth., 3 Barr 282; Henderson *v.* Hunter, 9 P. F. S. 343; Commth. *v.* Slifer, 1 Casey 23; Field *v.* Commth., 8 Casey 478; Ex parte Hennen, 13 Peters 230. That Father Stack did not regard his removal as unlawful at the time is shown by his letter of November 9th 1871, to Rev. Kœper. He thereby acknowledges that he had been treated kindly and considerately by the bishop, and admits that he was not deprived of his office as priest, for he stated his intention of preaching at Friendsville, which he subsequently did, and he afterwards declined the mission to Athens, Bradford county, which the bishop offered him.

The court below tried the case on the theory of submitting the question to the jury, whether there was reasonable cause for the removal. This was going farther than Stack was entitled to ask, and he has no ground for complaint. By his voluntary oath of ordination, he submitted himself to the domination of his bishop, and thereby made a law unto himself, knowing the centralization of power which is the corner-stone of the Roman Catholic Church, whereby the bishop is, by divine authority, the representative *in loco* of the Pope, who is the supreme head in matters of faith, law and discipline.

Mr. Justice Trunkey delivered the opinion of the court October 3d 1881.

When the plaintiff was ordained he obligated himself as follows: "I, Michael P. Stack, promise and swear that I will serve the missions of the diocese of Philadelphia, under the obedience of the ordinary, forever *in perpetuam*, so help me God, and these His Holy Gospels." Toward the end of the ceremony he placed his hands in those of the bishop, who then asked him, "Do you promise to me and my successors obedience and reverence?" and he answered, "I do promise it."

In the United States the Catholic Church is missionary, and there are no parish priests except, perhaps, in a portion of the territory acquired from France. The plaintiff assumed to discharge the functions of a priest in the missions of the diocese. Since his ordination the diocese of Scranton has been created of

territory formerly within the territory of the diocese of Philadelphia, and his obedience and reverence became due to the bishop of Scranton. Both bishop and priest, in their respective relations, are bound by the laws of their church, which are applicable to the missions in this country, and these laws define and limit the authority of the one and the obedience of the other.

The primary inquiry is, whether a priest appointed by his bishop to a mission in the diocese, is removable at the will of the bishop? This question was not submitted to the jury, but the court instructed them that under the law of the church a bishop has not only the right, but it is his duty, to remove a priest for sufficient cause. A number of the assignments of error are based upon that instruction. However much the plaintiff differs from all other witnesses respecting the unwritten law, or in his inferences from the written, there is no conflict in the testimony as to what the written law is which touches the question. Both parties concede the applicability of the enactments of the second Baltimore Plenary Council of 1866, a portion of which is proved by each. Paragraph No. 108 is thus rendered by Dr. Corcoran: "We confirm and again promulgate some decrees that have been passed by former councils of Baltimore. Whereas, very often it has been called into doubt by some whether prelates of the church had power in these states of the Union to depute priests, send them into another part of their diocese for the purposes of the sacred ministry, and also recall them when they judge fit in the Lord, we admonish all priests who live in this diocese, whether ordained therein or admitted into the same, that, mindful of the promises that they have made at their ordination, they refuse not to attend any mission that shall be assigned them by their bishop, if the bishop judge it sufficient for the decent sustenance of their livelihood, and consider also that that office be suitable to their strength and health. By this declaration, however, we wish to change nothing as to those priests who hold parochial benefices, of which one only, to wit, in the city of New Orleans, is as yet known to exist in this country. Nor do we, by any means, intend to derogate from the privileges that have been accorded to religious persons by the Holy See. Affirming the duty of the priest to attend to any mission that may be assigned to him, and recognizing the power of the bishop to appoint him thereto, or to recall him thence."

The plaintiff gives paragraphs 123 and 124 as follows: "Since formerly there existed by the highest, by the best right, as the Council of Trent says, distinct dioceses and parishes, and proper pastors were given to each flock, and there were rectors

of minor or inferior churches who should have the care, each one of his own flock; it is altogether desirable that, according to the custom of the universal church, parish priests, properly so called, as they exist in Catholic countries, should be constituted also in the churches of our provinces; but such is the condition of our times and circumstances that this cannot yet be done. The Fathers of this Plenary Council, however, are of the sentiment—their mind is—that gradually, and as far as circumstances will allow, our discipline in this matter may be conformed to the discipline of the universal church, or the universal discipline of the church." " We will, therefore, or wish that through all these provinces, especially in the larger cities where there are many churches, a district after the manner of a parish,. with accurately described limits, be assigned to each church, and that the rector thereof be accorded the right parochial, or *quasi* parochial rights."

And Dr. Corcoran states paragraph 125 thus : " By making use of the words parochial right, parish, and parish priest, we by no means intend to accord to the rector of any church that right which is called of immovability, or to take away or in any wise diminish that power which from the discipline received in these provinces, the bishop possesses, of depriving any priest of his office,\or transferring him elsewhere. But we admonish and exhort all bishops that they should use this their right only for grave reasons, and taking into full consideration the personal merits of the individual."

These provisions, in enactments specially made for the church in the United States, are too plain to admit of doubt as to the bishop's power to remove a priest. Their interpretation was for the court : Sidwell *v.* Evans, 1 P. & W. 383 ; Bock *v.* Lauman, 12 Har. 435. When the testimony is of unwritten law only, and is conflicting, a different case is presented, of which we need not speak. The council expressed a strong desire that parish priests, as they exist in Catholic countries, should be constituted here ; but declare the condition of our times and circumstances such that this cannot yet be done. Although they will or wish that in these provinces, in localities where there are many churches, a district after the manner of a parish may be assigned to each church, and that to the rector may be accorded the right parochial, or *quasi* parochial rights, they proclaim that it is not in any wise intended to diminish that power the bishop possesses of depriving a priest of his office, or transferring him elsewhere. They affirm and again promulgate the duty of the priest to attend any mission that may be assigned to him, and recognize the power of the bishop to appoint him thereto, or to recall him thence.

[Stack *v.* O'Hara.]

The pastoral relation is neither created nor dissolved by agreement between the priest and congregation—the bishop appoints or removes the shepherd as he deems for the priest's good, or for the interest of the flock.

Removal is the exercise of episcopal authority according to the bishop's judgment. It may be without supposition of wrong, and it leaves the priest in the same position as all other priests who are without employment. Suspension is a judicial act based on something which calls for such sentence. A sentence of suspension follows a trial for an offense, from which the priest may appeal; but for a removal the priest may have recourse to the bishop's superior. To confound removal with suspension, acts so different in character, is to lay the groundwork for misapplication of certain laws of the church, and also for the false conclusion that the bishop has no power of removal for grave cause, unless there first be a trial for some ecclesiastical offense.

When a priest is accused of an offense for which he may be convicted and punished, he is entitled to a trial according to the laws of the church, before he can be sentenced. But the law relating to such case throws no light on the question of the bishop's power of removal. Nor do the laws respecting parish priests, in Catholic countries, control enactments made for the government of bishops and priests in this country. It is true, as the plaintiff contends, and for which he cites Dr. Smith's Elements of Ecclesiastical Law, p. 381, that pastors in the United States should not be dismissed from their parishes, *ratione criminis*, save on regular trial; and no priest accused of an offense shall be punished save on regular trial. This has no bearing on the question of the bishop's power of removal at his discretion. As quoted in the plaintiff's own testimony, the same author, p. 170, § 401, says, " Ecclesiastics who are amovable at the will of the bishop may be, even against their will, dismissed without such trial or sentence." And p. 178, § 417, " The following ecclesiastical office-holders, chiefly, are amovable at the nod of the bishop—at the bishop's will; . . all pastors in this country, save one, perhaps, in New Orleans." And p. 179, " Again, bishops in this country do not, as a rule, remove pastors without sufficient reasons. Hence, in case a pastor is removed *sine causa*, without at the same time being placed over another congregation of equal importance, he may have recourse to the superior for redress, since such removal would seem to be not only illicit, but invalid." The author treats a dismissal, *ratione criminis*, as a very different thing from a removal for grave reason by the bishop, at his will.

Aside from the written law, the evidence is strong that it

[Stack *v.* O'Hara.]

has been the usage for bishops to appoint and remove pastors, from the planting of the church in the colonies to the present time.  Though often the power has been doubted, contests by priests in the civil courts on the ground of illegality have been very few.  It is not alleged that such removal had been declared unlawful previous to the litigation between these parties.  In a recent case, among the conceded facts was this, "By the usages of the Roman Catholic Church in New England, . . the bishop appoints the priests to the several parishes in his diocese and removes them at his pleasure:" Hennessey *v.* Walsh, 15 Am. L. Reg. 264.  However clear the bishop's power to remove a priest at his pleasure may appear in the unwritten law, we shall not dwell thereon, for the written is conclusive of the question.

, That portion of the charge which constitutes the thirteenth specification, taken by itself, perhaps, is erroneous, but not with the context.  It is in the midst of instructions respecting the rights, duties and obligations of the plaintiff and defendant, under the laws of their church, wherein the court ruled that the defendant had no right to remove the plaintiff from any malevolent or capricious spirit, or without a reasonable cause. And though it is said that the priest got his office from and holds it subject to the will of the bishop, and does not own it as other property, it is also said that both were bound to know the laws and established usages of the church which regulated their conduct in their respective offices and governed their official relations with each other.

The plaintiff urges that the removal so injured him in the property of his profession that if not contrary to the laws of the church, it is to the supreme law of the land.  His profession is that of a priest in the church. He acquired it by compact.  He holds it under a promise to obey the laws of the church and the proper orders of the bishop.  Were his contract void for its immorality or illegality, he could recover nothing for its breach. If illegal, he is neither entitled to restoration nor to damages for his removal.  If legal, and his removal was authorized by the terms of the compact, no law of the land is violated.  In this country the Church is completely separate from the State. Every church organization is voluntary on the part of its members, and the terms and conditions depend entirely upon its own rules.  The profession of priest or minister in any denomination is taken subject to its laws.  These he agrees to obey. If they become distasteful to him he can withdraw—no power can compel him to remain and perform his priestly functions; but if he violates the laws of his church, or disobeys the lawful commands made in accord with his compact, the civil courts will not maintain his footing in the church.  If the

plaintiff was removed in accord with the law of the church he has no cause of complaint. If such laws provide that the bishop may remove a priest without trial he has no right to a trial, and if they provide that he shall have recourse to the bishop's superior in case of wrongful removal, his remedy is by such recourse, for this is his contract.

The late Judge Redfield, in a note to Hennessey *v.* Walsh, *supra*, said, "Some principles are well settled by the repeated decisions of the courts with slight or no conflict. 1. The decisions of ecclesiastical courts, having by the rules or laws of the bodies to which they belong, jurisdiction of such questions, or the right to decide them, will be held conclusive in all courts of the civil administration, and no question involved in such decisions will be revised or reviewed in the civil courts except those pertaining to the jurisdiction of such courts or officers to determine such questions according to the law or usage of the bodies which they represent. 2. It is a universal rule of law, applicable not only to this subject, but to all subjects connected with legal administration, that one who becomes a member of any church or other society thereby consents to be governed by the rules, or laws, of such organization, and that he cannot justly claim to have suffered wrong or injury by the enforcement of such rules upon himself or his property, upon the maxim, *volenti non fit injuria*. And this maxim applies to cases when the party voluntarily places himself in a position ultimately to have an act done affecting his interests, or done at the will of another, as if he subjected himself directly and immediately to the act; upon the principle that one who puts the slowest agencies at work, which are sure in the end to produce a given result, is as truly the author of the ultimate result as if produced by ever so immediate and direct causes. 3. That the courts will not interfere with the internal police and discipline of churches or other voluntary societies, so long as they keep within the reasonable application of their own rules, which were known to the members, or might have been learned by them, upon reasonable inquiry, at the time of connecting themselves with the society or church."

The foregoing clearly stated principles repel the conclusion that the plaintiff's removal, if in accord with the law of the church, was contrary to the law of the land. They also show that the civil courts will not interfere where the ecclesiastical courts or officers have jurisdiction and have acted under their own rules, giving them a reasonable application. At the time the plaintiff was ordained, the law of the church was the same as now; no right has been taken from him or duty imposed by subsequent legislation; he knew then that if appointed

to a mission he was subject to removal, and the high authority, quoted in his testimony, says that if wrongfully removed he may have recourse to the superior for redress. He sought no redress under the law of his church, but at once resorted to the civil courts. Without saying that the court below erred in his favor—this question is not raised in the record—he was allowed the utmost latitude consistent with the religious liberty of the church. The Catholic priest is as much bound by the law of that church as is any Protestant preacher by the law of his. A principle which would authorize the civil courts to interfere with the pastoral relations, or with the operation of church laws, or with the discipline of members, in one religious organization, would also in all others. The church should be free to deal with its members, officers and ministers, according to its laws and established usages. It would be a grievous wrong to the church to rule that its priests and ministers are exempt from its proper discipline and authority because of their profession. They have no property in such profession that is shielded from the consequences of their broken vows and compacts. They neither acquire nor hold it as they do lands or chattels.

From what has already been said with reference to other points, it follows that the court was right in ruling that, "To enable the plaintiff to recover, the jury must be satisfied from the evidence that the plaintiff was wrongfully and unlawfully removed from his charge." Acting in the office of bishop, making a removal under the laws of the church; it will not be presumed that it was wrongfully made by the defendant.

The next matter to consider is the effect of the letter of November 5th 1871, by the defendant to the plaintiff, as follows:

"REV. SIR: Your administration of the affairs connected with the Church of the Annunciation has been such that I feel myself compelled to remove you and leave the church vacant. And I now forbid you to exercise any priestly function in Williamsport, even to say mass. This prohibition binds *sub gravi*. You may call at Scranton and I will inform you of my further intention in your regard."

The plaintiff contends that, "The real question, admitting for the argument that it was not *res adjudicata*, was the legal effect of the letter. Did it make such accusations against the plaintiff as gave him the right to have these vague accusations defined, and tried upon full notice and hearing, and opportunity of defense?" All through the trial, and in the points he submitted, the plaintiff claimed it was the province of the court to

construe or interpret the letter; and we are of opinion that the interpretation was correct. Little will be added to the remarks of the learned judge of the Common Pleas. In reading the letter, the law of the church respecting removal should be kept in view. Removal should not be made but for grave and sufficient reason. If the bishop cannot refer to the unskillful or careless management of the affairs of the church, or other fault, which mars the priest's usefulness in the congregation, without being held to the making of a criminal accusation, it were vain to enact that he may remove him, and to admonish that he do not remove without grave cause. The language of the letter implies bad administration of the affairs of the church. This is a grave cause, and could arise from one or more of many defects. in the priest not constituting an ecclesiastical offense. Sufficient reason may exist calling for removal where there is none for accusation and trial, or for suspension. In plain terms, the plaintiff was removed, and forbidden to exercise any priestly functions in Williamsport. This prohibition did not extend elsewhere, and the simplest rule of interpretation limits its operation to the place that is named, leaving him in possession of his priestly faculties, with liberty to exercise them in other places in like manner as any other unemployed priest. The church was located in Williamsport and embraced the English speaking or "Non-German Catholics" of Williamsport—the only other Catholic Church in that place being the German—and the prohibition was complete as to Williamsport. To have made it less extensive would have left an open door for its evasion. The words " *sub gravi* " relate to the prohibition, and if they mean all that the plaintiff says they do, he would suffer nothing because of them so long as he should keep the promise made at his ordination. It was unnecessary to assign a cause for the removal; the letter contains no accusation of crime, or of moral fault, yet states the grave reason. But if the words admit equally well of two constructions, one in accord with the lawfulness of the accompanying act, and the other opposed, they shall be taken in the sense which so accords; for it will not be presumed that a man intends to give a bad reason for a lawful act, thereby vitiating the act itself.

Moreover, if on the face of the letter there be room for doubt, it may be read in the light of the understanding of the parties at the time. Within four days thereafter the plaintiff called on the defendant at Scranton, and from there wrote to Rev. J. Kœper, pastor of the German Catholic Church in Williamsport: " The bishop says he will give me a mission of good income and free of debt. He thinks, very properly, that I do not relish the idea of paying off debts, or engaging myself with

brick and mortar. . . He holds to his intention of punishing the Irish congregation of Williamsport; says he will not send a priest there for some time. On reflection I think this course may prove beneficial. I intend going to Friendsville with Slattery for Sunday, and preaching for the natives." This is convincing that the plaintiff knew he was simply removed and that he still possessed his priestly faculties, with liberty to exercise them outside Williamsport wherever invited. He thought it might prove beneficial to punish the Irish congregation, and concedes that he did not relish paying off debts or engaging with brick and mortar. He was promised and was willing to accept another mission. Although smarting under his removal, he then felt no sting of an accusation for an alleged offense, nor did he claim a trial, nor did he think the removal unlawful based on the ground that he so disrelished paying debts that he had not well administered the affairs of the church. His own testimony reveals that he afterwards refused a mission because he thought it not good enough, and then it entered his mind to contest the removal—not by recourse to the bishop's superior—but in the civil courts.

On the date of the removal, the bishop wrote to Rev. Kœper directing him what to do with the property of the Church of the Annunciation, and what to do for the sick, but saying nothing of the plaintiff. The entire letter concerns the property and congregation, and the words " severe course " refer to the treatment of the congregation, which on reflection the plaintiff thought might prove beneficial. Even if those words could be construed as also applying to the removal of the plaintiff it would not change the nature of the act. The discipline could be severe without punishment in any sense other than is necessarily included in the removal of a priest against his will.

The assignments of error relating to the instructions respecting the several letters cannot be sustained. Nor can those resting on objections to testimony, on the ground that the interpretation of the letter of removal was for the court. At the plaintiff's request, the court did interpret the letter, and the admission of said testimony could not have affected the questions submitted to the jury.

We discover no error in the submission of facts on the question of reasonable cause for removal. Nor as to what were the rules of the church respecting the keeping and rendering of accounts by the priest to the bishop. There was evidence of rules relating to accounts. Without stating the rules, the court charged, " The only question is, are they required to be kept? If they are, then a failure to perform them is a neglect of duty; and a refusal to perform them, after request by the bishop, is a

[Stack *v.* O'Hara.]

willful dereliction of duty." If more specific instructions concerning the rules were desired they should have been requested. There is no unwarranted assumption of facts in the clauses of the charge set out in the 16th, 17th and 18th assignments, if said clauses be properly read in the context.

The jury having found that the plaintiff was not entitled to recover, and as the case does not go back for trial, the instructions respecting damages need not be remarked.

The remaining assignment that will be noted, is to the ruling that the proceeding in equity decides nothing except the question of costs. The decree of the court below in that case was, 1. That the removal of the plaintiff as pastor of the Church of the Annunciation was unlawful; 2. That the prohibition to the plaintiff to exercise any priestly functions in Williamsport was unlawful : and 3. That the defendant pay the costs, except the plaintiff's bill. This singular decree declared the defendant's act unlawful, yet gave the plaintiff no redress, the result being that each party paid a fraction of the costs. Had the bill been dismissed without prejudice, and the costs divided between the parties, the decree would have been less novel, but more in accord with the practice in Pennsylvania. It is fairly said that the opinion of this court, as filed, is in affirmance of that decree, and it having been so considered at the time by two of the five judges who heard the case, they dissented. A motion was made for re-argument, which was refused on the ground that nothing was decided but the question of costs, the Chief Justice filing an opinion concluding thus : " In concurring in the decree of the affirmance all that I meant to decide, and all that I think was meant to be decided, was that under the special circumstances of the case, the judge below exercised a sound discretion when he refused to impose all the costs on the appellee." He did not understand that it settled anything as to the powers and rights of the bishop over the priests : O'Hara *v.* Stack, 9 Nor. 492. Hence, but two of the judges concurred in the opinion, or in affirming anything but the disposition of the costs, and the court was clearly right in treating the case as if the bill had been dismissed without prejudice. That was the substantial act, though not the formal, of this court in the final disposition of the case on the motion for a re-argument.

Judgment affirmed.

Mr. Justice MERCUR, dissenting, filed the following opinion, in which GORDON, J., concurs :

When the case of O'Hara's appeal was here, 9 Norris 477, we held the present plaintiff in error, then appellee, had a right

of property in his profession as a Catholic priest, and a prohibition of the exercise of that profession by the then appellant, without accusation or hearing, was contrary to the law of the land. We declared that although his salary as pastor of the Church of the Annunciation was not for a specific sum, but was the product of pew rents and voluntary offerings, yet he had such a right of property therein as the law recognized. Without professing to overrule that case, or the well established principles there declared, the judgment now about to be pronounced in effect repudiates them, and strikes down the cardinal rules of law therein affirmed. Against this denial of a vital and most salutary right of property, I am constrained to record my strong dissent. In so doing I do not in the slightest degree deny the right of a church to enforce its discipline in all matters of faith and of doctrine. The right now affected is one of property. A profession is acquired by years of study, privation and expense. When obtained, it is property in the highest sense of the word. It should be protected as well as property in chattels and in lands. It was said, in Byrnes' Admrs. *v.* Stewart's Admrs., 3 Desaussure 478, "It cannot be doubted that a man's trade or profession is his property." That a Roman Catholic priest has a right of property in his profession is distinctly affirmed in Cummings *v.* State of Missouri, 4 Wallace 277. A section of the new constitution which operated as a bill of attainder against him was therefore held to be in conflict with the constitution of the United States. The right of property in a profession was recently affirmed in the case of Steinman and Hensel, members of the Lancaster bar.* The property of a priest of the Church of Rome in his profession, is of especial value to him, inasmuch as being once ordained as such his obligation is to serve in the priesthood for life, and it is declared in the English edition of the Council of Trent, page 175, that "it beseems not those who are enrolled in the divine ministry to beg or exercise any sordid trade to the disgrace of their order." Once a priest, then as long as he remains true to his church, his main temporal property is his profession.

The plaintiff's property in his profession was no mere abstract right. When thrust out of his church by the mandate of the defendant he was in the receipt of $2,900 annually. It was made up by the rent of pews, by marriage and baptismal fees, from Sunday collections and those made at Easter and Christmas.

On the trial the record in the former suit in equity, was given in evidence. The whole case is therefore before us.

* 14 Norris 220; 9 W. N. C. 145.

The gravamen of the complaint which we affirmed in the equity case was that no specific charge was made against the pastor, either of omission or of commission, averring in what respect his administration of the affairs connected with the church was not satisfactory; that he was not informed whether the complaint referred to spiritual or to temporal affairs; that he was given no information sufficient to enable him to answer and refute the complaint; at the same moment a vague charge was made, the edict issued, and the sentence pronounced.

It is now claimed that the severe language contained in the bishop's letter of the 5th November 1871, was not intended to apply to Mr. Stack, but to the congregation of the church of which he was pastor. This is clearly an after-thought. It was addressed to him alone. The complaint was of his administration only. He alone was forbidden to exercise priestly functions. The *sub gravi* bound him alone. The name of the congregation was not mentioned. Still further, in paragraph VI. of the bishop's answer under oath to the bill in equity, he " denies that it was his intention, either expressed or implied in said letter of removal, to close the said church against the contributors, pew-holders and congregation."

If, then, there was no intention to punish the congregation nor deprive them of any of their church privileges, the only person to whom the language could apply was to the discredited pastor.

It is not conducive to a just administration of the law to refine on any particular word used, but to consider the spirit and effect of the whole letter. It contained no words of Christian counsel or advice. It is true, it gave the disgraced priest the liberty of calling on the bishop, who promised to inform him of his further intention.

It is, however, said, a right of removal exists in the bishop. Removal does not mean suppression or silence. As we said before, Mr. Stack " was not only deprived of his right of property as pastor of that particular church; but he was also prohibited from exercising any priestly functions as a means of support elsewhere. The literal reading of the order forbade the exercise of such functions in Williamsport. Inasmuch, however, as he had been assigned to no other parish, the effect was to close the door of every parish against him."

A portion of Statute No. 8 of the Synod of Philadelphia of 1842, page 19, as given in evidence on the trial, declares : " And lest, with offense to the faithful, and contempt of the episcopal authority, priests who have received their letters dismissory from us or have been suspended or deprived of the pastorate, charge or possession, he should again undertake sacred functions in this

[Stack *v.* O'Hara.]

diocese without our license, we prohibit under pain of suspension to be incurred *ipso facto*, against a priest of this kind, although he be afterwards received into another diocese, undertaking any sacred function within this diocese, whether in the churches of seculars or regulars or any where else without our license or permission." At the time of the adoption of this statute Williamsport was within the diocese of Philadelphia, and the statute does not appear to have been repealed. It indicates the pecuniary loss sustained by the plaintiff.

It is conceded that the rules and discipline of the church, the cause of religion and the good order of society justly authorize the bishop to remove a priest from his charge for *cause*, and to transfer him from one parish to another as he may deem proper. O'Hara's Appeal, *supra*. But when the attempted removal is under circumstances reflecting on the priest's character and affecting his property in his profession, he is entitled to notice of the specific cause of complaint, and to an opportunity for refuting the charge. Without such notice, the removal is wrongful. The Minister of St. Mark's Evangelical Church of Butler *v.* Kopp, not reported ; McAuley's Appeal, 27 P. F. Smith 397 ; Kerr's Appeal, 8 Norris 97 ; Brown *v.* Hummel, 6 Barr 86.

In the bill filed by plaintiff, paragraph VII. he declared he was not aware of any act done or of anything left undone by him in the in the administration of the affairs connected with the Church of the Annunciation, by reason of which ecclesiastical censure or punishment could justly be imposed ; and that no such act or thing had been designated or made known to him. In the full answer of the bishop he does not deny this averment, nor does he charge any spiritual or temporal maladministration. In paragraph VII. of his answer he avers, *inter alia*, "that the said letter of removal and the removal in fact of the said complainant from his charge was not of the nature of ecclesiastical censure or punishment." He further proceeds to deny that the removal is unwarranted by the law of the Catholic Church or is contrary to the law of the land, and avers the act was one of ecclesiastical discipline authorized by the church, and "not within the jurisdiction of civil authority." This last averment sharply presents the real issue in the case. It is useless by any ingenious argument to cover it up or to avoid it. Are the civil courts powerless to intervene to protect rights of property when an attempt is made by any church organization, to strike them down?

If such be the case, then the language of the 9th section of the Declaration of Rights, which declares that one cannot be deprived of life, liberty or property unless by the judgment of his peers, or the law of the land, is of no force.

2 OUTERBRIDGE—16

[Louden *v.* Waddle.]

In the former case the bishop's views were not sustained by the court below. We affirmed the decree, thereby subjecting him to costs as fully as the court imposed them on him. If he has succeeded in the present case in showing that in fact cause for dismissal or removal did exist, although not previously charged, it should go in mitigation only of damages and not so operate as to bar the right of action. The evidence of an intention to transfer the plaintiff to another parish is very meager and unsatisfactory. The one he named was not vacant; besides, the congregation there was so small that to accept it, if not filled, would have been understood by the entire priesthood as a species of degradation and punishment. When this idea was stated by the plaintiff to the bishop, the latter answered he deserved the punishment, "because you are too proud." This was an admission of an intention to punish the plaintiff, not for any of the causes alleged on the trial, but by reason of his being proud only.

In one sense the plaintiff was removed. As if the occupant of a house is put out and his goods thrown into the street. When no other place is provided for him he is simply dispossessed. The plaintiff was not only dispossessed; but the strong sentiment and power of the church barred the door of every other church against him. We would sustain the 11th, 12th, 13th, 14th and 15th assignments, and such parts of the others as are in conflict with this opinion. The affirmance of this judgment is fraught with mischief that strikes at the very foundation of our civil government. It is the recognition of an authority as superior to the organic law of the land. In questions of property, all sectarian bodies must be held in subordination to civil authority.

Ecclesiastical opinions on amovability do not agree. We will not now review them, nor refer to some of the nice distinctions made. We prefer to adopt those views which are in harmony with the constitution, and with the genius and spirit of our institutions, and by which alone property can be duly protected.

Justice GORDON also dissents from the judgment, and concurs in this opinion.